# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 15, 2009

Charles R. Fulbruge III
Clerk

No. 07-40651

CODY WHEELER; DON DAVIS; DAVEY WILLIAMS

Plaintiffs - Appellees

v.

PILGRIM'S PRIDE CORP

Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Texas

Before JONES, Chief Judge, REAVLEY, JOLLY, DAVIS, SMITH, WIENER, BARKSDALE, GARZA, BENAVIDES, STEWART, DENNIS, PRADO, OWEN, ELROD, SOUTHWICK and HAYNES, Circuit Judges.[*]

REAVLEY, Circuit Judge:

Once more a federal court is called to say that the purpose of the Packers and Stockyards Act of 1921 is to protect competition and, therefore, only those practices that will likely affect competition adversely violate the Act. That is this holding.

---

[*] Judge KING and Judge CLEMENT did not participate in this decision.

This appeal is concerned only with § 202 of the Packers and Stockyards Act ("PSA") enacted in 1921[1] to cope with market control of the meat packing industry by five companies. That section as it stands today, codified as 7 U.S.C. § 192, is set forth in the appendix and referred to hereafter as codified. Congress has amended the PSA multiple times since its passage, including additional provisions and refining much of its scope, changing jurisdiction of federal agencies and bringing additional industries under protection, standing today as 7 U.S.C. § 181 – § 229c. The language at issue in this case in § 192 (a) and (b) remains as originally enacted without any significant change.

## This Appeal

Plaintiffs "grow" chickens for the defendant poultry producer and brought this suit with several claims that included the defendant's "deceptive, unlawful, unfair, capricious, arbitrary and discriminatory" conduct in violation of § 192(a) and (b). A specific complaint was that another grower was given a contract on preferable terms, violating the PSA because it was an unfair and deceptive trade practice. The defendant moved for summary judgment, arguing in part that the PSA requires a showing that the alleged practices have an adverse effect on competition. The district court denied the motion, holding that no showing of adverse effect on competition is necessary under § 192 (a) or (b) of the PSA. That court then allowed an interlocutory appeal under 28 U.S.C. § 1292(b) to decide

---

[1] Pub. L. No. 67-51, 42 Stat. 159.

the question of "whether a plaintiff must prove an adverse effect on competition in order to prevail under 7 U.S.C. §§ 192(a)-(b)." This court granted permission to appeal.

A panel of this court held that a plaintiff need not prove an adverse effect on competition to prevail under the statute. *Wheeler v. Pilgrim's Pride Corp.*, 536 F.3d 455 (5th Cir. 2008). The en banc court granted rehearing and disagrees with the panel and district court.

## **Judicial History**

The Supreme Court in 1922

The lengthy history in the courts began immediately after the PSA's enactment with an effort to enjoin its enforcement because of unconstitutionality. The following year the Supreme Court upheld the PSA in *Stafford v. Wallace*.[2] Chief Justice Taft, author of the opinion for the Court, recounted efforts of the government to protect sellers of cattle and purchasers of meat from the control of the purchase of live stock and preparation, distribution, and sale of meat products by the five great packing companies. As the Chief Justice said, "[i]t is helpful for us in interpreting the effect and scope of the Act in order to determine its validity to know the conditions under which Congress acted."[3]

---

[2] 258 U.S. 495, 513, 42 S. Ct. 397, 401 (1922).

[3] *Id.* (citing *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238, 38 S. Ct. 242 (1918)).

3

The Chief Justice introduced the PSA as regulating "the business of the packers done in interstate commerce and forbid[ding] them to engage in [using words of subsection (a)] unfair, discriminatory, or deceptive practices in such commerce, or to subject any person to unreasonable prejudice therein, or to do any of a number of acts to control prices or establish a monopoly in the business."[4]  He observed that the object of the PSA was to secure the flow of livestock from the farms and ranges to the slaughtering center and into meat products unburdened by collusion that unduly lowered the prices to the shipper and unduly increased the price to the consumer.

Then the opinion turns to previous cases, particularly the 1905 case of *Swift & Co. v. United States*,[5] where the Court enjoined violations of an anti-trust act of 1890 by those who refrained from bidding against each other in buying livestock and in fixing prices for the sale of fresh meat.

The Supreme Court concluded: "It is manifest that Congress framed the Packers and Stockyards Act in keeping with the principles announced and applied in the opinion in the *Swift* case."[6]

---

[4] 258 U.S. at 513, 42 S. Ct. at 401.

[5] 196 U.S. 375, 25 S. Ct. 276 (1905).

[6] 258 U.S. at 520, 42 S. Ct at 403.

We read this 1922 opinion of the Supreme Court to decide the PSA to be constitutional because it protects competition and opposes combinations in restraint of interstate trade.

The Seventh Circuit

The Seventh Circuit, where great packing companies have resided, has fielded most of the early cases applying the PSA. In 1939 it set aside an order of the Secretary of Agriculture against preferential discounts and trades allowed to some customers and not to others. *Swift & Co. v. Wallace*.[7] The Secretary had declared that the fact of competition was not material, but the court held that the decision had to take into consideration the effect that this disparate treatment had upon competition between customers and between Swift and others. In 1961 that court upheld the Secretary's order against a meat packer that had cut its prices to lessen or destroy competition with its competitor. *Wilson & Co. v. Benson*.[8] In reply to Wilson's argument that its price-cutting was not for the purpose of acquiring a monopoly or eliminating a competitor, and that the PSA did not prohibit a mere competitive injury or lessening of competition, the court said that the legislative history of the PSA supported a wider power to prohibit unfair methods of competition than did antecedent anti-trust legislation. In 1962 the Seventh Circuit held that an agreement to allow a competitor to bid to

---

[7] 105 F.2d 848 (7th Cir. 1939).

[8] 286 F.2d 891 (7th Cir. 1961).

5

purchase hogs for itself and another violated § 192(a) of the PSA because the result was to eliminate competition, whereas the packer's dissemination of price information to its dealers did not violate the PSA because the purpose was to consummate a sale rather than to compete. *Swift & Co. v. United States*.[9]

In 1968 the Seventh Circuit set aside an order of the Secretary of Agriculture stopping Armour and Company from giving consumers of its bacon a 50-cent refund.[10] The Secretary deemed the practice to be unfair and a violation of § 192(a) of the PSA because its return on bacon sales was less than its costs. The court held that lack of fairness and an unreasonable preference did not prove a violation of (a) and (b) of the PSA because Armour's refund program would not violate the Act absent an intent to eliminate competition or unless the effect might be to lessen competition. Lastly, the Seventh Circuit rejected a claim under the PSA for an "unfair and knowingly deceptive scheme" to sell "off-condition" hams, because there could be no legal claim under (a) of the PSA unless there was some intent to eliminate competition or unless the effect might lessen competition. *Pac. Trading Co. v. Wilson & Co.*[11]

Five Other Circuits

---

[9] 308 F.2d 849 (7th Cir. 1962).

[10] *See Armour & Co. v. United States*, 402 F.2d 712 (7th Cir. 1968).

[11] 547 F.2d 367 (7th Cir. 1976).

The Eighth Circuit in *Farrow v. United States Department of Agriculture* held that a practice which is likely to reduce competition may be an unfair practice in violation of the PSA, even in the absence of evidence that it had that result.[12] A later decision of that court, while affirming that rule, held that an agreement by feedlot owners to give a packing company a first refusal on the price for sale of cattle did not potentially suppress competition sufficiently to violate the PSA. *IBP, Inc. v. Glickman.*[13]

The Ninth Circuit upheld the Secretary's order against the practice of a group of packers who required auction stockyards to sell cattle subject to the cattle passing government inspection, holding that this was a conspiracy that created a likelihood that competitive harm would occur. Judge Sneed would have remanded for a further determination of the competitive effects. *De Jong Packing Co. v. United States Dep't of Agric.*[14]

In *Been v. O.K. Industries,*[15] the Tenth Circuit had before it an appeal with the same question as the one before us: does § 192(a) require proof that a practice injures or is likely to injure competition? That court recognized that Congress had listed specific acts in subsections (c), (d) and (e) that expressly restrain

---

[12] 760 F.2d 211 (8th Cir. 1985).

[13] 187 F.3d 974 (8th Cir. 1999).

[14] 618 F.2d 1329 (9th Cir. 1980).

[15] 495 F.3d 1217 (10th Cir. 2007).

competition whereas the same is not true of subsections (a) and (b), but concluded that this meant it was left to the courts to determine what anti-competitive practices could be unfair, unjustly discriminatory or deceptive. The Tenth Circuit followed the holding of the other federal courts addressing this issue to require a plaintiff who challenges a practice under § 192(a) to show that the practice injures or is likely to injure competition.

At trial of a case in the Eleventh Circuit the jury found that a poultry company had violated the PSA in terminating the plaintiffs' poultry growing contracts without economic justification. The jury then awarded plaintiffs $164,000 in damages. The district court set aside the award, granting judgment as a matter of law and holding that plaintiffs failed to show that the termination had an effect on competition. The Eleventh Circuit affirmed after reviewing the judicial history and said that "[e]liminating the competitive impact requirement would ignore the long-time antitrust policies which formed the backbone of the PSA's creation." *London v. Fieldale Farms Corp.*[16] The court concluded that the PSA required a plaintiff to show that the defendant's deceptive or unfair practice adversely affects competition or is likely to adversely affect competition.

This rule was applied by the Eleventh Circuit in *Pickett v. Tyson Fresh Meats, Inc.*,[17] where a jury found that Tyson's marketing agreement method of

---

[16] 410 F.3d 1295, 1304 (11th Cir. 2005).

[17] 420 F.3d 1272 (11th Cir. 2005).

cattle purchases caused the price of the cash market method, used in purchasing from plaintiff, to be lower. The jury found that plaintiff suffered substantial financial injury. The trial court rendered judgment for Tyson, and the court of appeals affirmed, because the evidence established that Tyson had a legitimate business interest justification for the market method, consistent with its need to meet competition. The court reiterated that the purpose of the PSA was not to upset the traditional principles of freedom of contract. To which it could be added: despite an unfair effect on the plaintiffs.

The Fourth Circuit approved the trial court's jury instruction requiring plaintiffs to prove defendants' conduct was likely to affect competition adversely in order to prevail on their claims under § 192(a) of the PSA. *Philson v. Goldsboro Milling Co.*[18] This opinion is unpublished, perhaps because the court thought no further precedent was needed on this issue.

### Congressional Experience and Acquiescence

An understanding of *Stafford v. Wallace*, as Chief Justice Taft told, and all of the judicial decisions noted above, becomes clearer the more we see the concerns and actions of Congress in enacting and amending the PSA over the years.

---

[18] No. 96-2542, 1998 U.S. App. Lexis 24630 (4th Cir. Oct. 5, 1998).

The story began with the growing control by five meat-packing conglomerates of the interstate food industries from 1890 to 1921.[19] Despite the Sherman Act and Justice Department actions, by 1916 the Big Five controlled eighty percent of all interstate commerce in the meat market and slaughtered forty percent of all animals used for food in America.[20] In 1917, President Woodrow Wilson directed the Federal Trade Commission to investigate the meat-packing industry to ascertain the facts about restraints of trade and what remedies could be taken.[21] In 1919, the Commission published a six-volume, three-thousand page report, explaining how the Big Five dominated the interstate meat-packing market through anti-competitive monopolistic behavior.[22]

The PSA was the response of Congress. The legislative debate surrounding the PSA supports the conclusion that it was designed to combat restraints on trade, with everyone from the Secretary of Agriculture to members of Congress

---

[19] *See* 61 CONG. REC. 1864-66 (statement of Rep. Voigt); *see also Current Legislation*, 22 COLUM. L. REV. 68, 68-69 (1922) (describing the efforts and effect the Big Five had on the interstate food markets).

[20] *See* 61 CONG. REC. 1868 (statement of Rep. Voigt) (citing, *inter alia*, Report of the Federal Trade Commission on the Meat Packing Industry (1919)).

[21] Letter from the FTC to the President (as reprinted in H.R. REP. NO. 66-1297, at 23 (1921)).

[22] *See* Report of the Federal Trade Commission on the Meat Packing Industry (1919); *see also* Summary of the FTC Report 31-32 (as reprinted in H.R. REP. NO. 66-1297, at 24 (1921)) (stating that the monopoly of the Big Five "is not a casual agreement brought about by indirect and obscure methods, but a definite and positive conspiracy for the purpose of regulating purchases of live stock and controlling the price of meat . . . .").

testifying to the need of this statute to promote healthy competition.[23]   When

asked specifically what kind of "unfair, unjustly discriminatory, or deceptive

practices" the statute was designed to combat, one of the authors –

Representative Sydney Anderson – cited predatory purchasing patterns, "wiring

on," and "split shipments," all of which were anticompetitive acts which were

restraints of trade.[24]

After 1921 and up to 2002, Congress has amended § 192 seven times

without making any changes that would affect the many court interpretations

---

[23] *See, e.g.*, *Meat Packer: Hearing on H.R. 14, H.R. 232, H.R. 5034, H.R. 5692 Before the H. Comm. on Agric.*, 67th Cong. 246 (1921) (statement of Henry C. Wallace, Secretary of Agriculture) ("I believe in absolute, free competition.  So far as you can do that by legislation I think it ought to be done[.]"); *id.* at 26 (statement of Rep. Anderson) ("What this bill seeks to do is prohibit the particular conditions under which monopoly is built up, and to prevent a monopoly in the first place and to induce healthy competition."); *see also* 61 CONG. REC. 1801 (1921) (statement of Rep. Haugen) (stating that "the matters to be dealt with [in the packing industry] are great questions of combinations and monopolies and methods and practices of unfair competition, usually of great magnitude and country wide in their effect"); 61 CONG. REC. 1863 (statement of Rep. Voigt) ("While there is a large number of meat packers in this country doing an interstate business, it is understood that this legislation is aimed at the so-called Big Five packers [who have] as complete a monopoly of the meat packing business as it is possible for a man or set of men to acquire or that they could wish for."); 61 CONG. REC. 1880 (statement of Rep. Hudspeth) (stating "if I understand this bill, if it has any power at all, it puts in the hands of the Secretary of Agriculture power in preventing combinations putting up prices of meat on the hoof.").

[24] *See* 61 CONG. REC. 1888. (statement of Rep. Anderson).  The predatory purchasing schemes Representative Anderson described involved packers purchasing goods and livestock at higher-than-market prices until competitors were driven out of business, followed by the packers immediately dropping the prices once the competitors had exited the market.  *See id.* "Split shipments" involved "purchases, whereby, through the interchange of information, the split lots are made to sell at the same price on different markets regardless of how many packers are involved in marketing the purchase."  *Methods of Meat Control Used by the Packers, As Set Forth by the Federal Trade Commission*, N.Y. TIMES, Aug. 7, 1919.  "Wiring on" involved a practice "whereby a shipper who forwards his live stock from one market to another for the purpose of securing a better price is punished regardless of which packer he sells to in the second market."  *Id.*; *see also Stafford*, 258 U.S. 495, 42 S. Ct. at 400.

cited above.[25] It is reasonable to conclude that Congress accepts the meaning of § 192(a) to require an effect on competition to be actionable because congressional silence in response to circuit unanimity "after years of judicial interpretation supports adherence to the traditional view." *General Dynamics Land Sys., Inc. v. Cline.*[26]

## Role of the Secretary of Agriculture

When hearings were held on the original legislation, Henry C. Wallace, Secretary of Agriculture, testified in support of regulation of the meat-packing industry and said: "I believe in absolutely free competition. So far as you can do that by legislation I think it ought to be done[.]"[27] The PSA then provided for complaints of § 192 violations to be brought before the Secretary, who could order the violations to cease. Failure to obey his order was penalized. Appeals went to a circuit court.

In 1935 Congress added coverage of live poultry dealers or handlers to meat packers in the PSA. The Secretary is not delegated authority to adjudicate

---

[25] *See* Pub. L. 74-272, 49 Stat. 649 (1935); Pub. L. 85-909, § 1, 72 Stat. 1749 (1958); Pub. L. 94-410, § 3, 90 Stat. 1249 (1976); Poultry Producers Financial Protection Act of 1987, Pub. L. 100-173, § 3, 101 Stat. 917 (1987); Food, Agriculture, Conservation, and Trade Act Amendments of 1991, Pub. L. 102-237, §1008, 105 Stat. 1818, 1898 (1991); Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriation Act of 2000, Pub. L. 106-78, § 912, 113 Stat. 1135, 1205 (1999); Farm Security and Rural Investment Act of 2002, Pub. L. 107-171, § 10502, 116 Stat. 134, 509 (2002).

[26] 540 U.S. 581, 593-94, 124 S. Ct. 1236, 1244-45 (2004).

[27] *See Meat Packer: Hearing On H.R. 14, H.R. 232, H.R. 5034, H.R. 5692 Before the H. Comm. on Agric.*, 67th Cong. 246 (statement of Henry C. Wallace, Secretary of Agriculture).

alleged violations of § 192 by live poultry dealers.[28]  Enforcement is now in the hands of the Secretary and by private suit in federal court.[29]

The Secretary has at times interpreted the PSA to prohibit the forbidden practices regardless of whether competitive injury is caused.  The Seventh Circuit has had to correct that interpretation in the cases discussed above.  In *Armour and Company v. United States* the court explained that "Congress gave the Secretary no mandate to ignore the general outline of long-time antitrust policy by condemning practices which are neither deceptive nor injurious to competition nor intended to be so by the party charged."[30]

The Government has appeared here as amicus to contend that the courts have had the PSA wrong and that it should be construed to make unfair practices unlawful without regard to competition.  It urges *Chevron*[31] deference, but that is unwarranted where Congress has delegated no authority to change the meaning the courts have given to the statutory terms, as the Eleventh and Tenth Circuits have held.[32]

## Decision

---

[28] 7 U.S.C. § 193(a).

[29] 7 U.S.C. § 209.

[30] 402 F.2d at 722.

[31] *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778 (1984).

[32] *London*, 410 F.3d at 1304; *Been*, 495 F.3d at 1227.

We conclude that an anti-competitive effect is necessary for an actionable claim under the PSA in light of the Act's history in Congress and its consistent interpretation by the other circuits. The anti-competitive behaviors of the big meat packing companies of the 1920s motivated Congress to pass the Act, and the Supreme Court in *Stafford v. Wallace* concluded that the Act was constitutional because of the anti-competitive concerns of Congress. It is those concerns which remain paramount in the Act today and which led so many of the circuits to reach the same conclusion. We agree with the view that referring to outside sources may be inappropriate when determining the meaning of an unambiguous statute. It is appropriate and necessary here, however, where § 192(a) and (b) of the PSA employs the terms "unfair," "unjust," "undue," and "unreasonable." Which meaning of "fair," for example, do our dissenters choose in the four columns of Black's Law Dictionary, Ninth Edition? It is apparent that these words do not "extend to the outer limits of [their] definitional possibilities." *Dolan v. U.S. Postal Service.*[33] Rather, their meaning "depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis."[34] Given the clear antitrust context in which the PSA was passed, the placement of § 192(a) and (b) among other subsections that clearly require anticompetitive intent or effect, and

---

[33] 546 U.S. 481, 486, 126 S. Ct. 1252, 1257 (2006).

[34] *Id.*

the nearly ninety years of circuit precedent, we find too that a failure to include the likelihood of an anticompetitive effect as a factor actually goes against the meaning of the statute.

The law rules best by being predictable and consistent. It is predictability that enables people to plan their investments and conduct, that encourages respect for law and its officials by treating citizens equally, and that enables an adversary to settle conflict without going to court in the hope of finding judges who will choose a favored result. Predictability requires the judge deciding a case to set her course to reach the judgment that another, fully informed of the evidence and precedent, would expect. Predictability must be the lodestar. We must not be affected by personal preference, or by different notions of justice or what the law ought to be.

How then would an informed person predict the case before us to be decided? He would begin by expecting us to look to the opinions of other circuits for persuasive guidance, always chary to create a circuit split. *Curr-Spec Partners, L.P. v. Comm'r*;[35] *Alfaro v. Comm'r*.[36] After understanding the circumstances and concern of those responsible for this statute, he would add all that has been said and held by the Supreme Court and so many circuit courts nearly nine decades since the passage of the PSA, never changed by Congress.

---

[35] 579 F.3d 391, 399 n.37 (5th Cir. 2009).

[36] 349 F.3d 225, 229 (5th Cir. 2003).

So informed, he could not expect a judge to interpret the statute by looking only at the bare words of § 192 (a) and (b). Surely he would predict that the next court judgment would be consistent with the judgments of the other circuits.

## Ruling

The order of the district court on the question presented was incorrect. To support a claim that a practice violates subsection (a) or (b) of § 192 there must be proof of injury, or likelihood of injury, to competition.

# Appendix

Packers and Stockyards Act
7 U.S.C. § 192

§ 192. Unlawful practices enumerated

It shall be unlawful for any packer or swine contractor with respect to livestock, meats, meat food products, or livestock products in unmanufactured form, or for any live poultry dealer with respect to live poultry, to:

(a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or

(b) Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect; or

(c) Sell or otherwise transfer to or for any other packer, swine contractor, or any live poultry dealer, or buy or otherwise receive from or for any other packer, swine contractor, or any live poultry dealer, any article for the purpose or with the effect of apportioning the supply between any such persons, if such apportionment has the tendency or effect of restraining commerce or of creating a monopoly; or

(d) Sell or otherwise transfer to or for any other person, or buy or otherwise receive from or for any other person, any article for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce; or

(e) Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce; or

(f) Conspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business, or (2) to apportion purchases or sales of any article, or (3) to manipulate or control prices; or

(g) Conspire, combine, agree, or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by subdivisions (a), (b), (c), (d), or (e) of this section.

EDITH H. JONES, Chief Judge, with whom THOMAS M. REAVLEY, JERRY E. SMITH, and PRISCILLA R. OWEN, Circuit Judges, join, concurring:

I concur in Judge Reavley's opinion but write separately to address in more detail the "plain meaning" of the Packers and Stockyards Act of 1921. The words of the Act are, on their face, empty vessels, but this does not leave courts "free to pour a vintage that we think better suits present-day tastes." *United States v. Sisson*, 399 U.S. 267, 297, 90 S. Ct. 2117, 2133 (1970). Rather, we have a duty to give those words meaning consistent with their statutory and common-law antecedents, which were known well by the Members of the Congress that passed the Act. The words we are asked to interpret were terms of art, and their meanings were fixed by judicial definition and consistent usage. To ignore this evidence would be to turn the plain meaning rule on its head. Read in the proper context, these provisions concern only those business dealings that have an actual or potential effect on competition.

As Judge Garza, writing in dissent, states, "Proper statutory analysis begins with the plain text of the statute." "[I]n interpreting a statute a court should always turn first to one, cardinal canon before all the others. . . . [C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, this first canon is also the last: 'judicial inquiry is complete.'" *Connecticut National*

*Bank v. Germain*, 503 U.S. 249, 253–54, 112 S. Ct. 1146, 1149 (1992) (citations omitted). That we look primarily to the text, rather than attempt to divine Congress's intentions otherwise, is the law of this circuit. *See, e.g., In re Rogers*, 513 F.3d 212, 225–26 (5th Cir. 2008) (citing *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S. Ct. 1023, 1030 (2004)).

When the words are ambiguous or vague, however, our inquiry cannot end there. In this case, the language of §§ 202(a) and (b) of the Packers and Stockyards Act of 1921 (codified at 7 U.S.C. § 192) resists any attempt to discern its plain meaning:

> **§ 192. Unlawful practices enumerated**[1]
>
> It shall be unlawful for any packer or swine contractor with respect to livestock, meats, meat food products, or livestock products in unmanufactured form, or for any live poultry dealer with respect to live poultry, to:
>
>> (a)   Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or
>>
>> (b)   Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect . . . .

---

[1] As amended and codified. The amended text differs in no relevant respect from that enacted in 1921. *See* Packers and Stockyards Act of 1921, Pub. L. No. 67-51, § 202, 42 Stat. 159, 161 (1921); Pub. L. 74-272, 49 Stat. 648, 649 (1935) (amending § 202 to reach live poultry dealers and handlers); Pub. L. 85-909, § 1, 72 Stat. 1749 (1958) (amending § 202 to reach, *inter alia*, activities of packers relating to livestock and poultry).

"Unfair," "unjustly discriminatory," "undue or unreasonable preference": Read literally, they establish no standard at all.[2] (The Act's bar on "deceptive practice[s]," by contrast, is clearer.) Does this mean that each court and jury must determine, in its unique estimation, what is unfair, unjust, undue, or unreasonable? If so, the law—what is allowed, what prohibited—would essentially become a matter of fact. Any contract within the Act's ambit would be subject to challenge as putatively "unfair."

Even Judge Garza, who finds the words of §§ 202(a) and (b) to be unambiguous, rejects this result. Unfairness, he suggests, is a question for the trial court to be determined "in the context of industry standards, the economic justifications for the actions, and the motives and actions of those concerned." Although not illogical, this gloss is also nowhere in the statute. It is in no way "plain" from the statutory text. Presumably, it does not encompass all contracts that are "unfair" or "unreasonable" because they confer some advantage on one party or another. Such a prohibition "would be violative of reason, because it would include all those contracts which are the very essence of trade." *United States v. Trans-Missouri Freight Association*, 166 U.S. 290, 351, 17 S. Ct. 540, 563 (1897) (White, J., dissenting). So by what *objective* criteria may these concepts be

---

[2] *See, e.g.,* A.L.A. Schechter Poultry Corporation v. United States, 295 U.S. 495, 530–33, 55 S. Ct. 837, 843–44 (1935) (the term "fair competition" does not provide an "adequate definition of the subject to which the codes [promulgated under § 3 of the National Industrial Recovery Act] are to be addressed").

limited? As I explain below, Congress, by its use of legal terms that were well defined at the time, "certainly did not delegate any such free value-choosing role to the courts." ROBERT BORK, THE ANTITRUST PARADOX 53 (1993).

It would be a mistake to assume that the plain meaning rule requires interpretation of the PSA in a linguistic vacuum, ignoring how its terms were used by Congress or understood at the time of the Act's passage. "Words that have acquired a specialized meaning in the legal context must be accorded their *legal* meaning." *Buckhannon Bd. and Care Home, Inc. v. West Virginia Department of Health and Human Resources*, 532 U.S. 598, 615, 121 S. Ct. 1835, 1846 (2001). It is therefore a strong presumption that adoption of the wording of a statute "carries with it the previous judicial interpretations of the wording." *Carolene Products Co. v. United States*, 323 U.S. 18, 26, 65 S. Ct. 1, 5 (1944). In such borrowing, Congress "presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed." *Morissette v. United States*, 342 U.S. 246, 263, 72 S. Ct. 240, 250 (1952). More poetically, "if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings its soil with it." *Moskal v. United States*, 498 U.S. 103, 121, 111 S. Ct. 461, 472 (1990) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 537 (1947)). To be sure, this presumption is not inviolable. Its strength

varies "with the similarity of the language, the established character of the decisions in the jurisdiction from which the language was adopted, and presence or lack of other indicia of intention." *Carolene Products*, 323 U.S. at 26, 65 S. Ct. at 5.

The Interstate Commerce Act of 1887 ("ICA") and the Federal Trade Commision Act of 1913 ("FTCA") provided the template for what became the PSA. The language of the PSA is more than just similar to the language of these predecessors; it follows their contours precisely. Consider the first paragraph (of two) of § 3 of the ICA:

> That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

That pattern is repeated in § 202(b) of the PSA:

> It shall be unlawful for any packer to . . . (b) Make or give, in commerce, any undue or unreasonable preference or advantage to any particular person or locality in any respect whatsoever, or subject, in commerce, any particular person or locality to any undue or unreasonable prejudice of disadvantage in any respect whatsoever.

One concerned trains; the other, meatpackers. Otherwise, they are identical.

Similarly, § 202(a) of the PSA follows both the ICA and FTCA. That section prohibits "any unfair, unjustly discriminatory, or deceptive practice or device in

commerce." The term "unjustly discriminatory" can be traced to § 2 of the ICA, which defines and prohibits "unjust discrimination." The entirety of the section, as well as the specific terms "unfair" and "deceptive," are a slight variation on § 5 of the FTCA: "That unfair methods of competition in commerce are hereby declared unlawful."

Not only is the language of the PSA nearly identical to that of its predecessors, but this choice of terms was deliberate. Their meaning had been firmly established in numerous court decisions that placed definite limits on the authority of, respectively, the Interstate Commerce Commission and Federal Trade Commission.

By 1921, the Supreme Court had spoken repeatedly on the ICA, FTCA, and other laws of Congress regulating competition—that is, the field of antitrust. The "character" of the terms borrowed for the PSA was, in the main, well-settled. Take "unfair," the meaning of which had been the subject of the Court's 1920 opinion in *Federal Trade Commission v. Gratz*:

> The words 'unfair method of competition' are not defined by the statute and their exact meaning is in dispute. It is for the courts, not the commission, ultimately to determine as a matter of law what they include. They are clearly inapplicable to practices never heretofore regarded as opposed to good morals because characterized by deception, bad faith, fraud, or oppression, or as against public policy because of their dangerous tendency unduly to hinder competition or create monopoly. The act was certainly not intended to fetter free and fair competition as commonly understood and practiced by honorable opponents in trade. . . .

Nothing is alleged which would justify the conclusion that the public suffered injury or that competitors had reasonable ground for complaint. All question of monopoly or combination being out of the way, a private merchant, acting with entire good faith, may properly refuse to sell, except in conjunction, such closely associated articles as ties and bagging. If real competition is to continue, the right of the individual to exercise reasonable discretion in respect of his own business methods must be preserved.

*Federal Trade Commission v. Gratz*, 253 U.S. 421, 427–28, 40 S. Ct. 572, 575 (1920).[3] "Unfair" was not an inkblot in 1921. Congress could not have expected, then, that its use of the term would occasion a free-ranging inquiry into the equities of business practices; rather, Congress intended, and made plain by its choice of language, that injury to competition would be an element of the inquiry.

The meaning of "undue or unreasonable preference" and the associated terms and concepts from § 3 of the ICA was, if anything, even more definite. These, too, incorporated the concept of competitive injury. Surveying the Supreme Court's cases, Justice Owen Roberts described its consistent application of the term from 1896 onwards:

> The theory of the act is that the carriers in initiating rates may adjust them to competitive conditions, and that such action does not amount to undue discrimination; *Texas & Pacific Ry. Co. v. Interstate Commerce Commission*, 162 U.S. 197, 16 S. Ct. 666, 40 L. Ed. 940 [(1896)]. There the charging of rates on import traffic

---

[3] *Gratz* was overruled by *Federal Trade Commission v. Sperry & Hutchinson Co.*, 405 U.S. 233, 92 S. Ct. 898 (1974), on the basis of the FTC Act's legislative history. That fact has little relevance to the established meaning of "unfair" at the time of the PSA's enactment. Further, the grounds for *S&H*—that the FTC Act was intended by Congress as both an antitrust *and* a consumer-protection statute—do not apply to the PSA, which regulated the dealings of packers, and later of poultry processors, that operated at the manufacturer and wholesale levels. For these reasons, *S&H* is inapplicable.

moving from a port on through bills of lading, much lower than those fixed for domestic transportation, was held not to amount as matter of law to discrimination forbidden by section 3. The carrier showed, in justification of the lower rates on import traffic, that, unless these were permitted, water and rail-and-water competition would divert the traffic away from the port of New Orleans and the carrier's lines extending from that port. Since that decision it has been recognized that export and import shipments, although not made on through bills, might lawfully be transported at rates below those charged for domestic traffic between the same points. *Interstate Commerce Comm. v. Baltimore & Ohio R.R. Co.*, 145 U.S. 263, 276, 12 S. Ct. 844, 36 L. Ed. 699 [(1892)]; *Interstate Commerce Comm. v. Alabama Midland Ry. Co.*, 168 U.S. 144, 164, 18 S. Ct. 45, 42 L. Ed. 414 [(1897)]; *Louisville & N.R. Co. v. Behlmer*, 175 U.S. 648, 671, 20 S. Ct. 209, 44 L. Ed. 309 [(1900)]; *Inter-Mountain Rate Cases*, 234 U.S. 476, 483-485, 34 S. Ct. 986, 58 L. Ed. 1408 [(1914)].

*Texas & P. Ry. Co. v. United States*, 289 U.S. 627, 636–37, 53 S. Ct. 768, 771–72 (1933). This was not, however, an innovation of the ICA but longstanding practice under the laws of Great Britain on which the ICA, and by extension the PSA, was patterned:

> In construing statutory provisions forbidding railway companies from giving any undue or unreasonable preference or advantage to or in favor of any particular person or company, or any particular description of traffic, in any respect whatever, the English courts have held, after full consideration, that competition between rival lines is a fact to be considered, and that a preference or advantage thence arising is not necessarily undue or unreasonable.

*Interstate Commerce Commission v. Alabama Midland Ry. Co.*, 168 U.S. 144, 164, 18 S. Ct. 45, 48 (1897) (citations omitted). From the earliest cases, then, the Court recognized that the ICA was "not designed to prevent competition between different [rail] roads" and that actions undertaken in furtherance of such

competition were therefore not undue or unreasonable preferences.[4] *Id.* at 164–65, 18 S. Ct. at 48; see also *Interstate Commerce Commission v. Chicago Great Western Ry. Co.*, 209 U.S. 108, 119, 28 S. Ct. 493, 495 (1908) ("in fixing their own rates, they [railroads] may take into account competition with other carriers, provided only that the competition is genuine, and not a pretense").

As for "unjustly discriminatory," used in § 202(a) of the PSA, it was also a term of art, borrowed from § 2 of the ICA. Any independent meaning that it bears, however, is somewhat obscured by the tendency of courts to treat it as a creative variation on "undue and unreasonable preference," thus reading §§ 2 and 3 of the ICA as one. But there were exceptions. In *Chicago Great Western Ry. Co.*, the court considered the term apart from the language of § 3. The railway had,

---

[4] Thus, it came to be that carriers could, in certain competitive circumstances, charge lower tariffs for longer than for shorter distance over the same track, despite § 4's apparent prohibition on this practice. The court's explanation for this seeming departure from the statutory text is instructive: "In considering the act comprehensively it was pointed out that the generic provisions against preference and discrimination expressed in the 2d and 3d sections of the act were all-embracing, and were therefore operative upon the 4th section as well as upon all other provisions of the act." *United States v. Atchison, T. & S.F.R. Co. (Inter-Mountain Rate Cases)*, 234 U.S. 476, 482, 34 S. Ct. 986, 990 (1914). This general rule was animated, and also limited, by the competitive-effects test the court considered inherent in §§ 2 and 3 :

> [W]here competitive conditions authorized carriers to lower their rates to a particular place, the right to meet the competition by lowering rates to such place was not confined to shipments made from the point of origin of the competition, but empowered all carriers, in the interest of freedom of commerce and to afford enlarged opportunity to shippers, to accept, if they chose to do so, shipments to such competitive points at lower rates than their general tariff rates: a right which came aptly to be described as 'market competition' because the practice served to enlarge markets and develop the freedom of traffic and intercourse.

*Id.* at 483, 34 S. Ct. at 990. Congress subsequently amended the ICA to ratify this approach, as concerned competition between the railroads and cargo vessels. *See* Pub. L. No. 61-218, § 8, 36 Stat. 539, 547–48 (1910).

in seeming contravention of the statutory text, charged higher rates for the shipment of livestock than for dressed meats and prepared products (known as "packing-house products"). The ICC determined this to be a violation of both §§ 2 and 3. The Supreme Court rejected that result, holding that the railway's honest competitive motive precluded a finding of unjust discrimination:

> An honest and fair motive was the cause of the change in rates, honest and fair on the part of the Great Western in its effort to secure more business, and equally honest and fair on the part of the other railway companies in the effort to retain as much of the business as was possible. In other words, this competition eliminates from the case an intent to do an unlawful act, and leaves for consideration only the question whether the rates as established do work an undue preference or discrimination . . . .

*Chicago Great Western Ry. Co.*, 209 U.S. at 122, 28 S. Ct. at 498. As further evidence that "unjust discrimination" is that which injures competition, the court held that, against the backdrop of a carrier's near-absolute right to reduce rates, the ICC was empowered to prevent "excessively low," or predatory, rates through its power to prevent unjust discrimination under § 2. *Skinner & Eddy Corp. v. United States*, 249 U.S. 557, 566, 39 S. Ct. 375, 378 (1919); *id.* at 567–68, 39 S. Ct. at 379 (§ 2 weighs against a proffered reading of the ICA that "would rather ensure monopoly than preserve competition").

Thus, it is apparent not only that the terms of art employed §§ 202(a) and (b) of the PSA were clearly defined in jurisprudence, but also that none could be read as prohibiting legitimate competitive activity.

Congress knew that. The report of the House Committee on Agriculture which accompanied the PSA demonstrates Congress's reliance on decisions construing the ICA and FTCA. Of the eight pages of the report concerning the PSA's meatpacker provisions, six-and-a-half consist of a detailed exposition of Supreme Court decisions on the meaning and constitutionality of these earlier acts. H.R. REP. No. 67-77, at 2–10 (1921). The decisions cited include: *Interstate Commerce Commission v. Louisville & N.R. Co.*, 227 U.S. 88, 91, 33 S. Ct. 185, 187 (1913) (administrative decisions are reviewable by the courts and whether rates are unreasonable is "a matter of law"); *Southern Pac. Co. v. Interstate Commerce Commission*, 219 U.S. 433, 449–50, 31 S. Ct. 288, 293 (1911) (a rate change is not "unreasonable" merely because it may damage the interests of a rail customer); *Federal Trade Commission v. Gratz*, 253 U.S. 421, 428, 40 S. Ct. 572, 575 (1920) (no "unfair method of competition" under the FTCA when firm engaged in tying but it was not "alleged that they held a monopoly . . . or had ability, purpose or intent to acquire one"); *Interstate Commerce Commission v. Diffenbaugh*, 222 U.S. 42, 46, 32 S. Ct. 22, 24 (1911) (despite the "permissive" phrasing of the prohibition on "any undue or unreasonable preference or advantage," the ICA "does not attempt to equalize fortune, opportunities, or abilities"); *Skinner & Eddy Corp. v. United States*, 249 U.S. 557, 565–66, 39 S. Ct. 375, 378 (1919) ("the main source of the commission's influence to prevent excessively low rates"—e.g., those intended to effect "the elimination of water

competition"—"lies in its power to prevent unjust discrimination"). That Congress was deeply familiar with the Supreme Court's competition jurisprudence is beyond doubt.

And that Congress intended to adopt and apply large swaths of existing competition law to the packing industry is also apparent. The legislative history of the PSA is voluminous and (as for most laws) not entirely unambiguous, in certain respects. Where it lacks ambiguity, however, is in its reflection of the usage and plain meaning of words like "unfair" and "unreasonable" as used in § 202. As Judge Reavley's opinion ably demonstrates, the immediate purpose of the PSA was to prevent the abuse of monopoly and restraint of trade by the "Big Five" meatpackers. S*ee, e.g.*, *Committee on Agriculture of the House of Representatives, Hearing on Meat Packers*, May 2, 1921, at 12 (discussing, in brief, "the necessity for this legislation": preventing the packers from "combination, apportionment of territory and of markets, as well as the oppression of competitors"). Achieving this purpose, supporters stated, would ultimately aid farmers and growers and reduce the price of food for consumers. *See, e.g., Hearing on Meat Packers,* at 54 (statement of National League of Women Voters); H.R. Rep. 85-1048, at 1 (1957). The means to these ends, it has been recognized, was to improve the competitive environment:

> The act provides that meatpackers subject to its provisions shall not engage in practices that restrain commerce or create a monopoly. They are prohibited from buying or selling any article for the

purpose of or with the effect of manipulating or controlling prices in commerce. They are also prohibited from engaging in any unfair, deceptive, or unjustly discriminatory practice or device in the conduct of their business, or conspiring, combining, agreeing, or arranging with other persons to do any of these acts.

*Id.*[5]

In sum, the evidence of Congress's intent, while not itself dispositive, confirms, and does not repudiate, the view that the broad words of § 202 were to be considered in light of their established meanings, as terms of art limited to competitive wrongs.

The structure of the statute does not countervail. The dissent suggests that, because §§ 202 (c), (d), and (e) explicitly prohibit certain acts that have anticompetitive effect, (a) and (b) must strike at something different, apart from injury to competition. This construction is necessary, says the dissent, to prevent subsections (a) and (b) from swallowing, and rendering superfluous, subsections (c), (d), and (e). Further, it argues that subsection (e), rather than (a) and (b), is the true catch-all for anticompetitive behavior.[6]

---

[5] This was also the understanding of the Congress that amended the PSA to reach live poultry sales, as stated in a statutory finding. See Pub. L. 74-272, 49 Stat. 648 (1935) (stating the necessity of regulation to curb practices that resulted in producers "receiving prices far below the reasonable value of their live poultry" and "unduly and arbitrarily enhancing the cost to the consumers" and that were therefore an "undue restraint and unjust burden on interstate commerce").

[6] In this, the dissent abandons, in part, its hyper-literalism. To the dissent, § 202(e)'s prohibition on acts that have the effect of "restraining commerce" is merely a "'catch-all' for the competitive injury sections." But read literally, it is far more than that. The term "restraining commerce" is "broad enough to embrace every conceivable contract or combination which could be made concerning trade or commerce or the subjects of such commerce." *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 60, 31 S. Ct. 502, 516 (1911). The simple

That construction does not accord with the text of the statute. Subsection (c) proscribes the apportioning of supply in restraint of trade. Both subsections (d) and (e) proscribe manipulation of prices, and all three subsections proscribe specific actions that may create a monopoly. These subsections do not reach facts that may constitute certain familiar antitrust violations, e.g., refusals to deal, boycotts, non-price restraints such as credit or quality terms, tying agreements, even mergers or joint ventures. They simply do not cover the waterfront of anticompetitive behavior. Moreover, if (a) and (b) are to be read as literally as the dissent suggests, they seem to swallow (c), (d), and (e) and render those provisions superfluous. Similarly, if subsection (e) is a catch-all for anticompetitive behavior, it would render superfluous subsections (c) and (d).

The more natural reading, which avoids these infirmities, is that subsections (a) and (b) are catch-all provisions, intended to cover whatever actions create an actual or potential restraint of trade. Subsections (c), (d), and (e) prohibit specific practices only if they adversely affect competition, while (a) and (b) still deal with the marketplace but in a broader way than (c), (d), and (e). None of the text is superfluous.

Because of their provenance, the words of §§ 202(a) and (b) of the Packers and Stockyards Act are susceptible to a plain meaning: To prove that a practice

---

formation of a partnership does, in a literal sense, restrain commerce: the partners agree not to compete against one another. Few would argue, though, that every partnership, or indeed every commercial contract, is a "restraint on commerce."

is "unfair," "unjustly discriminatory," or an "undue or unreasonable preference," a plaintiff must demonstrate an actual or potential adverse impact on competition. For this reason, as well as those identified by Judge Reavley, I believe that this court should decline this invitation to upset the Act's long-established meaning.

EMILIO M. GARZA, Circuit Judge, with whom E. GRADY JOLLY, RHESA H. BARKSDALE, JAMES L. DENNIS, EDWARD C. PRADO, JENNIFER WALKER ELROD, and CATHARINA HAYNES, Circuit Judges, join, dissenting. T h i s appeal presents a single narrow question, certified to us by the district court pursuant to 28 U.S.C. § 1292(b): whether a plaintiff must prove an adverse effect on competition to prevail in a suit alleging a violation of Packers and Stockyards Act Sections 202(a) and (b), 7 U.S.C. § 192(a) and (b), ("PSA"). The PSA provides:

> It shall be unlawful for any packer or swine contractor with respect to livestock, meats, meat food products, or livestock products in unmanufactured form, or for any live poultry dealer with respect to live poultry, to:

> (a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or

> (b) Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect; or

> (c) Sell or otherwise transfer to or for any other packer, swine contractor, or any live poultry dealer, or buy or otherwise receive from or for any other packer, swine contractor, or any live poultry dealer, any article **for the purpose or with the effect of apportioning the supply** between any such persons, if such apportionment has the **tendency or effect of restraining commerce** or of **creating a monopoly**; or

> (d) Sell or otherwise transfer to or for any other person, or buy or otherwise receive from or for any other person, any article **for the purpose or with the effect of manipulating or controlling prices**, or of **creating a monopoly** in the acquisition of, buying, selling, or dealing in, any article, or of **restraining commerce**; or

34

(e)　　Engage in any course of business or do any act **for the purpose or with the effect of manipulating or controlling prices**, or of **creating a monopoly** in the acquisition of, buying, selling, or dealing in, any article, or of **restraining commerce**; or

(f)　　Conspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business, or (2) to apportion purchases or sales of any article; or (3) to manipulate or control prices; or

(g)　　Conspire, combine, agree, or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by subdivisions (a), (b), (c), (d), or (e) of this section.

7 U.S.C. § 192 (emphasis added). Because the unambiguous language of § 192 leads me to believe that § 192(a) and (b) do not require a showing of competitive injury, I respectfully dissent.

I

Plaintiffs-Appellees Cody Wheeler, Don Davis, and Davey Williams (together, the "Growers") are farmers who grow chickens known as "broilers" for Defendant-Appellant Pilgrim's Pride Corporation ("PPC"), a processor and dealer referred to as an "integrator" in the chicken industry. The Growers and PPC operate within a contractual relationship whereby PPC provides the Growers with the chicks, feed, and supplies required to raise chickens. In exchange, the Growers care for the chickens until they reach maturity, at which time they are returned to PPC. The chicks, maturing chickens, feed, and medicine remain the property of PPC at all times. This is known as the "grow-out" process. It takes approximately two months to grow-out a flock. The Growers' operations (and the operations of other growers) are geographically clustered into areas called

"complexes."[1] PPC compensates the Growers under a "tournament system." In essence, PPC ranks the Growers against one another and against the other growers operating in their complex. PPC then compensates the Growers based on the quality of their broilers, the number that survive the grow-out process, and the amount of feed and supplies the Growers used.

At least one grower operates under a different system from the Growers. Lonnie "Bo" Pilgrim ("Mr. Pilgrim"), PPC's founder and chairman, purchases chicks, feed, and supplies from PPC rather than having them consigned to him. Operating in a different complex from the Growers, Mr. Pilgrim then raises the chickens at his farm and sells them back to PPC. Rather than compensating Mr. Pilgrim under the tournament system, PPC pays Mr. Pilgrim the lesser of a weekly quoted market price or 102% of his costs. According to the Growers' pleadings, Mr. Pilgrim's arrangement yields him higher compensation than they receive. The Growers further allege that PPC refused to offer them growing arrangements similar to Mr. Pilgrim's.

The Growers sued PPC under the PSA. Specifically, the Growers alleged that PPC's refusal to afford them an opportunity to operate under the same terms as an insider, is "unfair and unjustly discriminatory" and affords Mr. Pilgrim an "undue or unreasonable preference or advantage" in violation of § 192(a) and (b).[2] The Growers raised additional claims against PPC, as well, that need not be described in detail for the purposes of the appeal. PPC moved for summary judgment arguing that the Growers did not allege an adverse effect

---

[1] PPC's broiler production operations are subdivided into numerous complexes, which are located in many different regions of the United States. Each "complex" has at least one pullet farm, breeder farm, hatchery, feed mill, and processing plant. Because PPC provides the feed, which is expensive to transport, it requires growers who raise broilers for a particular complex to be located within fifty miles of the complex and its feed mill.

[2] The section of the PSA relevant to this appeal is codified in the United States Code at 7 U.S.C. § 192. I refer, at times, to § 192(a) and (b) simply as (the "PSA") or as ("subsections (a) and (b)").

on competition, as required to prevail under § 192(a) and (b). The district court found no such requirement in the PSA and denied the motion for summary judgment. Pursuant to 28 U.S.C. § 1292(b), the district court then entered an order certifying the following issue for appeal: whether a plaintiff must prove an adverse effect on competition in order to prevail under 7 U.S.C. § 192(a) and (b).

A panel of this court affirmed the district court's order. *Wheeler v. Pilgrim's Pride Corp.*, 536 F.3d 455 (5th Cir. 2008). The panel held that "the language of sections 192(a)-(b) is plain, clear, and unambiguous, and ... it does not require the Growers to prove an adverse effect on competition." *Id.* at 460. It also addressed the PSA's legislative history, not because it was necessary or proper in order to construe the statute, but because it was the panel's "point of departure" from other circuit courts that have held an adverse effect on competition is required. *Id.* at 458, 461-62. The panel concluded that the legislative history does "not paint a clear picture of Congress's intent," *id.* at 462, and that it may be read to support the proposition that § 192(a) and (b) do not require a plaintiff to prove an adverse effect on competition. *Id.* at 461. Judge Reavley dissented stating:

> Sections 192(a) and (b) of the Packers and Stockyards Act may be read differently, and this panel majority reading is certainly reasonable. However, I incline to the meaning given "unfair" by the Tenth Circuit in *Been v. O.K. Indus. Inc.*, 495 F.3d 1217 (10th Cir. 2007) and, in any event, would not create a circuit split after so many contrary circuit decisions over many years.

*Id.* at 462-63 (Reavley, J., dissenting).

PPC petitioned the court for rehearing en banc. The court granted the petition and ordered that the appeal be reheard en banc. The parties and a number of amici curia submitted briefs.[3] Following the en banc rehearing, the

---

[3] The Government filed an amicus brief in this case arguing that the court should give deference to the USDA's construction of the PSA. The USDA does not require a showing of

court voted to reverse the district court, holding that a competitive injury must be shown in order to state a claim under § 192(a) and (b). Because I believe that no such showing is required, I dissent.

II

Proper statutory analysis begins with the plain text of the statute. *See Permanent Mission of India to the United Nations v. City of New York*, 127 S. Ct. 2352, 2356 (2007) ("We begin, as always, with the text of the statute.") (citation omitted); *Watt v. Alaska*, 451 U.S. 259, 265 (1981) ("The starting point in every case involving construction of a statute is the language itself.") (quotation omitted); *see also In re Rogers*, 513 F.3d 212, 225 (5th Cir. 2008). "It is well established that when a statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms." *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) (internal quotation marks and citation omitted). Section 192(a) prohibits "unfair, unjustly discriminatory, or deceptive" practices or devices. Section 192(b) prohibits "undue or unreasonable" preferences, advantages, or disadvantages. Neither section contains language limiting its application to only those acts or devices, which have an adverse effect on competition, such as "restraining commerce." Under well-settled principles, courts must refrain from reading additional terms, such as those that would require an adverse effect on competition, into these sections. *See Lamie*, 540 U.S. at 538 (holding that if the

---

competitive injury under § 192(a) or (b). Although the USDA is not entitled to Chevron deference because the PSA is unambiguous, the court should give "respect to the experience and expertise of the USDA regarding the PSA." *Been*, 495 F.3d at 1239 (Hartz, J., concurring/dissenting); *see also United States v. Mead Corp.*, 533 U.S. 218, 227-28 (2001) (Courts generally give considerable weight to an executive department's construction of a statute it is entrusted to administer). The USDA "has consistently taken the position that in order to prove that any practice is 'unfair' under §§ 202(a) (7 U.S.C. § 192(a)) or 312(a) (7 U.S.C. § 213(a)) of the Act, it is not necessary to prove predatory intent, competitive injury, or likelihood of injury . . . ." *In re Ozark County Cattle Co.*, 49 Agric. Dec. 336, 365 (1990) (quoting *In re Corn State Meat Co.*, 45 Agric. Dec. 995, 1023 (1986)); *see also* 1 John H. Davidson et al., AGRICULTURAL LAW § 3.47, at 244 (1981).

text evinces "a plain, nonabsurd meaning" then the court should not "read an absent word into the statute"); *see also Bates v. United States*, 522 U.S. 23, 29 (1997) (holding that courts "ordinarily" should "resist reading words or elements into a statute that do not appear on its face").

The remaining parts of § 192 further support the view that subsections (a) and (b) do not require a plaintiff to prove an adverse effect on competition. Subsections (c)-(e), unlike subsections (a) and (b), prohibit only those acts, which have the effect of "restraining commerce" or which produce another common antitrust injury, such as "creating a monopoly." If Congress had intended to limit the scope of subsections (a) and (b) to prohibit only those acts with the effect of "restraining commerce," it could have included the same language it employed in subsections (c)-(e). Congress did not. This omission is strong evidence that Congress did not intend subsections (a) and (b) to require a plaintiff to prove an adverse effect on competition. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("'Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972) )).[4] Similarly, if Congress had intended for the courts to read "restraining commerce" into every section of the PSA, then there is no reason why Congress would have included "restraining commerce" only in subsections (c)-(e). By judicially engrafting an adverse effect on competition requirement onto subsections (a) and (b) when Congress intentionally omitted one, the

---

[4] We consistently have applied this canon of construction since deciding *Wong Kim Bo*. *See, e.g.*, *Arif v. Mukasey*, 509 F.3d 677, 681 (5th Cir. 2007); *Comacho v. Tex. Workforce Comm'n*, 408 F.3d 229, 236 (5th Cir. 2005); *Nuovo Pignone, SpA v. Storman Asia M/V*, 310 F.3d 374, 384 n.16 (5th Cir. 2002); *United States v. Juvenile No. 1*, 118 F.3d 298, 305 (5th Cir. 1997); *United States v. Shear*, 962 F.2d 488, 490 (5th Cir. 1992); *In re Timbers of Inwood Forest Assocs., Ltd.*, 793 F.2d 1380, 1402 (5th Cir. 1986).

majority oversteps its proper role of interpreting the statute as written. *See Wong Kim Bo*, 472 F.2d at 722.

Other words used in subsections (a) and (b) further rebut a construction requiring competitive injury. For example, subsection (a) makes it unlawful to engage in or use any "deceptive practice." It defies common sense that Congress meant to allow some deceptive practices, so long as they did not adversely affect competition, while prohibiting others that did impact competition. If the majority is correct to construe subsection (a) to require competitive injury, then deceptive practices that do not adversely affect competition are permissible under the PSA. In light of the plain language of subsections (a) and (b), this makes no sense: the prohibitions listed in subsections (a) and (b) are stated as absolute bans, unlike the prohibitions listed in subsections (c) through (e), which bar conduct only if it adversely affects competition. Indeed, subsection (b) prohibits unreasonable preferences or advantages, and undue or unreasonable prejudice or disadvantage, "*in any respect*." This language, creating an unqualified prohibition of listed practices, is inconsistent with, and would be rendered superfluous by, a qualification that only those listed practices that adversely affect competition are prohibited. It is a basic precept of statutory construction that we should give effect to every clause and word of a statute where possible and should not construe statutes in a way that renders words or clauses superfluous. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

Under the majority's reading, Congress did not need to include specific anticompetitive language in any subsection because it effectively limited the PSA to competitive injury through a series of committee discussions and house reports. This of course begs the question why Congress chose to include any anticompetitive language at all if it was so clear that competitive harm permeated the entire statute. By holding that the subsections with no mention of competitive harm nonetheless require a showing of competitive injury, the

majority renders superfluous the express anticompetitive language in subsections (c)-(e). Courts should, however, attempt to give effect to every clause and word of a statute. *TRW Inc.*, 534 U.S. at 31.

The violence wrought on the statute by the majority's interpretation is even more clear when one considers subsection (e), which broadly prohibits persons from engaging "in **any** course of business or . . . **any** act" that has as its purpose or effect "manipulating or controlling prices, or of creating a monopoly . . . or of restraining commerce." 7 U.S.C. § 192(e) (emphasis added). If, as the majority holds, subsections (a) and (b) also require the specific prohibited conduct to affect competition, then those subsections are rendered superfluous in their entirety because they would be completely subsumed by subsection (e). Subsection (e) prohibits *any* act for the purpose or with the effect of manipulating or controlling prices or restraining commerce, which would cover all of the acts specified in subsections (a) and (b) if they also required an anticompetitive effect.

Borrowing from the Tenth Circuit's opinion in *Been v. O.K. Industries, Inc.*, 495 F.3d 1217, 1229 (10th Cir. 2007), PPC tries to overcome this problem by suggesting that subsections (a) and (b) were meant as a "catch-all" for behavior not covered by subsections (c)-(e). But, it seems quite obvious that subsection (e), which prohibits *any* act for the purpose or with the effect of manipulating or controlling prices or restraining commerce, is the "catch-all" for the competitive injury sections. By prohibiting *any* act for the purpose or with the effect of manipulating or controlling prices or restraining commerce, subsection (e) reaches anticompetitive behavior not reached by the more specific anticompetitive provisions of subsections (c) and (d). On the other hand, as written, subsections (a) and (b) reach conduct that is clearly not reached by subsections (c)-(e), which are limited to anticompetitive behavior. For instance, a contract, such as the one at issue in this case, giving preferential treatment to

the founder and largest shareholder of a company might well be "unfair" within the meaning of subsection (a), but not satisfy the "restraining commerce" requirement of subsections (c)-(e). Likewise, limiting an allegedly preferential pay system to company insiders without a valid business justification for doing so might constitute an "undue or unreasonable preference" within the meaning of subsection (b), even though the "restraining commerce" requirement of subsections (c)-(e) could not be met. The majority's decision to follow *Been* in writing a competitive injury requirement into subsections (a) and (b) destroys their unique function in the name of creating a "catch-all" that already exists in subsection (e).

Looking beyond the text of § 192 to other parts of the PSA, I find further evidence that § 192(a) and (b) do not require a showing of competitive injury. For example, like § 192(a), § 213(a) prohibits covered entities from engaging in or using "any unfair, unjustly discriminatory, or deceptive practice or device . . . ." 7 U.S.C. § 213(a). Although § 213(a) has the same language as § 192(a), courts have not construed it to require an adverse effect on competition.[5] For instance, in *Bowman v. USDA*, we stated that a failure to make prompt payment to a shipper by a person subject to the PSA "would be a proscribed deceptive practice under § 213(a)." 363 F.2d 81, 85 (5th Cir. 1966). Failure to make prompt payment in no way involves competitive injury, yet it was found to be

_____

[5] *See, e.g.*, *Butz v. Glover Livestock Comm'n, Co.*, 411 U.S. 182, 183-84 (1973) (incorrect weighing of livestock violated, among other provisions, § 213(a)); *Spencer Livestock Comm'n Co. v. Dept. of Agric.*, 841 F.2d 1451, 1454-55 (9th Cir. 1988) (upholding a finding of a § 213(a) violation "where the evidence establishes a deceptive practice, whether or not it harmed consumers or competitors"); *Peterman v. USDA*, 770 F.2d 888, 890 (10th Cir. 1985) ("bait-and-switch" was an "unfair and deceptive practice" under § 192(a)); *Bosma v. USDA*, 754 F.2d 804, 808-09 (9th Cir. 1984) (market agent violated § 213(a) by failing to inform consignors that he was the actual purchaser of their livestock); *Van Wyk v. Bergland*, 570 F.2d 701, 704-05 (8th Cir. 1978) (failure to pay for livestock violated § 213(a)); *United States v. Donahue Bros.*, 59 F.2d 1019, 1022-23 (8th Cir. 1932) (commingling shippers' funds was "unfair" and a violation of § 213 because the purpose of the "prohibition against unfair practices is to protect shippers").

"unfair" under § 213(a). Because § 192(a) contains virtually identical language, it should not be construed differently. *See, e.g.*, *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning."). Further, Congress provides an example of an "unfair practice" in § 228b-1(b), which concerns prompt payment by live poultry dealers in cash sales. It provides that "any delay or attempt to delay" collection of funds in such sales "shall be considered an 'unfair practice' in violation of this chapter. Nothing in this section shall be deemed to limit the meaning of the term 'unfair practice' as used in this chapter." 7 U.S.C. § 228b-1(b). The failure to pay one grower promptly would have no apparent adverse effect on competition; yet Congress expressly states that it is an "unfair practice" under the PSA. Because identical words within the same statute should be given the same meaning, "unfair practice" in § 192(a) likewise cannot require competitive injury. *See Powerex Corp*, 551 U.S. at 232.

Neither PPC, the majority, nor the other circuits have provided an alternative reading of the plain text of § 192(a) and (b), instead choosing to divine the meaning of the PSA from selected portions of its legislative history and cases based on that history. The plain language of the PSA, however, is clear. Some subsections contain "restraining commerce" language and some do not. We have to give effect to this difference. *See Wong Kim Bo*, 472 F.2d at 722. The most natural reading is that those subsections with the "restraining commerce" language require a competitive injury and those without it do not. Because the majority's construction of the PSA avoids this straightforward conclusion only by reading absent terms into the statute, it should be rejected. The district court correctly held that the language of § 192(a) and (b) is plain, clear, and unambiguous, and that it does not require the Growers to prove an adverse effect on competition. Because § 192(a) and (b) plainly, clearly, and

43

unambiguously do not require an adverse effect on competition, I would so hold and go no further. *See Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 167 (2004) ("Given the clear meaning of the text, there is no need to . . . consult the purpose of [the statute] at all."); *Lamie*, 540 U.S. at 534 (holding that unless a statute is "ambiguous on the point at issue," a court should not resort to legislative history in interpreting it); *Rogers*, 513 F.3d at 225-26 (citing *Carrieri v. Jobs.com Inc.*, 393 F.3d 508, 518-19 (5th Cir. 2004)) ("Only after application of the principles of statutory construction, including the canons of construction, and after a conclusion that the statute is ambiguous may the court turn to legislative history."); *Guilzon v. C.I.R.*, 985 F.2d 819, 823 n.11 (5th Cir. 1993) (citation omitted) ("Fifth Circuit law is crystal clear that when, as here, the language of a statute is unambiguous, this Court has no need to and will not defer to extrinsic aids or legislative history.").

## III

The majority and the circuits on which it relies forsake the plain language approach, and instead delve into the historical circumstances surrounding the passage of the statute to determine its meaning. This methodology is directly opposed to our case law and the case law of the Supreme Court. *See Aviall Servs., Inc.*, 543 U.S. at 159; *Hammack v. Baroid Corp.*, 142 F.3d 266, 271 (5th Cir. 1998) (noting that "theories of underlying intent or purpose cannot trump statutory language"). Because history and policy considerations lend support to conflicting interpretations, such an approach "creates more confusion than clarity about the congressional intent." *Lamie*, 540 U.S. at 539. This confusion, unlike the plain language, is not a proper basis from which to construe the statute.

To illustrate the point, one only need consider the two primary "legislative history" and "policy" bases upon which our sister circuits rest their findings of an adverse effect on competition requirement. First, they rely on H.R. 85-1048

(1958), which states: "the primary purpose of [the PSA] is to assure fair competition and fair trade practices in livestock marketing and in the meatpacking industry." *Id.* at 1. Second, they rely on *Stafford v. Wallace*, 258 U.S. 495, 514-15 (1922), which observed that the "chief evil" Congress feared in passing the PSA was the monopoly of meat industry packers. Most obviously, Congress spoke of assuring fair competition as the PSA's "primary" purpose, not as the PSA's only purpose, and the Supreme Court spoke of monopoly as the "chief" evil against which the PSA protects, not as the "only" evil. Thus, *Stafford* is no authority for foreclosing the view that the PSA protects against harms that have no adverse effect on competition. *See id.* Moreover, a closer look at the House Report shows no intention to limit the PSA as much as other circuits argue.

The very passages of the House Report upon which our sister circuits rely may be read to support the contrary proposition; namely, that § 192(a) and (b) do not require a plaintiff to prove an adverse effect on competition. First, the "primary purpose of this Act is to assure fair competition **and** fair trade practices." H.R. 85-1048 at 1 (1957), reprinted in 1958 U.S.S.C.A.N. 5212, 5213 (emphasis added). In the very sentence upon which the other circuits place so much emphasis is evidence of a second purpose that does not involve competitive harm. Even if it were true that fair competition was the PSA's "primary purpose," the House described other purposes as well:

> The primary purpose of this Act is to assure fair competition **and** fair trade practices in livestock marketing and in the meatpacking industry. The objective is to safeguard farmers and ranchers against receiving less than the true market value of their livestock and **to protect consumers against unfair business practices** in the marketing of meats, poultry, etc. **Protection is also provided** to members of the livestock marketing and meat industries **from unfair, deceptive, unjustly discriminatory**, and monopolistic practices of competitors, large or small.

***

> The act provides that meatpackers subject to its provisions shall not engage in practices that restrain commerce or create monopoly. They are prohibited from buying or selling any article for the purpose of or with the effect of manipulating or controlling prices in commerce. They are **also prohibited** from **engaging in any unfair, deceptive, or unjustly discriminatory practice or device** in the conduct of their business, or conspiring, combining, agreeing, or arranging with other persons to do any of these acts.

H.R. Rep. No. 85-1048 at 1-2 (emphasis added). While these passages support the view that the PSA's *primary* purpose is to protect fair competition, the PSA goes further. It also was intended to "protect consumers from unfair business practices,"[6] to protect members of the livestock marketing and meat industries from "unfair, deceptive, and unjustly discriminatory" practices, and to prohibit meatpackers, more generally, from "engaging in any unfair, deceptive, or unjustly discriminatory practice or device in the conduct of their business." *Id*. Indeed, by using "also prohibited" to separate "unfair, deceptive, or unjustly discriminatory practice and device" from language describing injuries to competition such as "restrain[ing] commerce," "creat[ing] monopoly," and "manipulating or controlling prices," Congress evinced its intent for the PSA to sweep more broadly than only those injuries which have an adverse effect on competition. *Id.; see Spencer Livestock Comm'n Co. v. Dep't. of Agric.*, 841 F.2d 1451, 1455 (9th Cir. 1988) (observing that while the PSA's primary purpose was to assure fair competition and prevent monopolistic practices, it also sought to provide protection from unfair and deceptive business tactics).

---

[6] In her concurrence, Chief Judge Jones attempts to distinguish the FTC Act, which the Supreme Court has interpreted not to require an adverse affect on competition, *see Federal Trade Commission v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1974) (discussed *infra*), from the PSA by suggesting "that the FTC Act was intended by Congress as both an antitrust *and* a consumer-protection statute" whereas the PSA was directed solely at antitrust. Given that one of the specifically enumerated purposes of the PSA was to "protect consumers from unfair business practices," this supposed distinction does not, as Chief Judge Jones suggests, render *Sperry & Hutchinson* inapplicable.

These passages from the House Report do not paint the clear picture, argued by the majority, that Congress had a singular purpose in passing the PSA. Instead, they reveal uncertainty. That is the point. "These uncertainties illustrate the difficulty of relying on legislative history here and the advantage of our determination to rest our holding on the statutory text." *Lamie*, 540 U.S. at 542. Especially where Congress's intentions and concerns are equivocal, it is better to be guided by plain language and the basic precept: "it is ultimately the provisions of our laws rather than the principal [or the "primary" or the "chief"] concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998).

IV

In reading an adverse effect on competition requirement into § 192(a) and (b), the other circuits have departed from this basic rule. The majority now decides to follow suit, relying on, among others, recent decisions from the Tenth and Eleventh Circuits: *London*, *Pickett*, and *Been*.[7] These decisions reached beyond the PSA's clear and unambiguous text, choosing instead to be guided by its legislative history and policy considerations. They should have been guided by the text. *See Cooper*, 543 U.S. at 167; *Lamie*, 540 U.S. at 534; *Rogers*, 513 F.3d at 225-26; *Guilzon*, 985 F.2d at 823 n.11.

In *London*, the court ignored the "cardinal canon" of statutory construction: follow the unambiguous words of the statute.[8] *See Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-254 (1992) ("[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others . . . a legislature says in a statute what it means and means in a statute what it says

---

[7] *London v. Fieldale Farms Corp.*, 410 F.3d 1295 (11th Cir. 2005); *Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272 (11th Cir. 2005); *Been*, 495 F.3d 1217.

[8] *Pickett* merely followed *London* and, therefore, its construction of the PSA is flawed for the same reasons. See *Pickett*, 420 F.3d at 1279-80.

47

there."). Instead, the court chose to be guided by the PSA's legislative history, "antitrust ancestry," and "policy considerations." *London*, 410 F.3d at 1307. Even so, its analysis of the purposes of the statute ignores portion of the legislative history and case law. *See id*. at 1302 (citing selected portions of H. R. Rep. No. 85-1048 and *Stafford* while ignoring other parts of that report and cases that state another purpose of the PSA was to protect producers from deceptive and unfair business practices).[9]

*Been*'s logic is flawed because it too never properly analyzed the plain text of the statute and because it relied on the unsound analysis in *London*. *Been*, 495 F.3d at 1228-29. As in *London*, *Been* failed to address portions of the PSA's legislative history and *Stafford* that support a conclusion that subsections (a) and (b) do not require competitive injury. *Id*. at 1232-33. *Been* also strained to distinguish other Tenth Circuit cases that came to contrary conclusions. *Id*. at 1230 (attempting to distinguish *Peterman v. USDA*, 770 F.2d 888 (10th Cir. 1985), which held that a "bait and switch" tactic violated § 192(a)'s ban on deceptive practice without mention of competitive injury). Further, *Been* focuses on the PSA's backdrop in antitrust laws, but never addresses why Congress enacted the PSA if it were intended only to mirror pre-existing laws. *Id*. at 1228. *But see In re Western Cattle Co.*, 47 Agric. Dec. 992, 1052 (1988) (rejecting arguments that would treat the PSA as "nothing more than a mirror of the antitrust laws"). Lastly, where *Been* did briefly address the statutory text, interpreting § 192(a) to be a catch-all, 495 F.3d at 1229, its analysis is simply

---

[9] *See e.g., Spencer Livestock Comm'n Co. v. Dep't of Agric.*, 841 F.2d 1451, 1455 (9th Cir. 1988) (rejecting argument that the PSA requires proof of an anticompetitive effect, which the court found was based on an "incomplete understanding of the objectives of the Act"); *Bosma v. USDA*, 754 F.2d 804, 808 (9th Cir. 1984); *Rice v. Wilcox*, 630 F.2d 586, 590 (8th Cir. 1980); *Van Wyk v. Bergland*, 570 F.2d 701, 704 (8th Cir. 1978); *Soloman Valley Feedlot, Inc. v. Butz*, 557 F.2d 717, 718 (10th Cir. 1977); *Swift & Co. v. United States*, 393 F.2d 247, 253 (7th Cir. 1968) (all reaching the same conclusion); *Been*, 495 F.3d at 1241-42 (Hartz, J., concurring/dissenting) (same).

wrong as explained above. *See supra,* Part II, pp. 8-9.

*Been*, *Pickett*, and *London* engage in almost no analysis of the plain language of the PSA, instead preferring to focus on legislative history and purpose. Although the opinions purport to be rich with legislative history and purpose, their analysis ignores sections of the legislative history that support an alternate reading of the PSA. What little textual analysis they do perform, suggesting that subsection (a) is the "catch-all" for the PSA, is wrong. Because nothing in their holdings warrants a departure from the plain language of the statute, the majority's decision to follow our sister circuits is imprudent. *See Sobranes Recovery Pool I, LLC v. Todd & Hughes Constr. Corp.*, 509 F.3d 216, 226 (5th Cir. 2007).

V

While the Tenth (*Been*) and Eleventh (*Pickett* and *London*) Circuits[10] have held that a competitive injury is required under the PSA, the other circuits have not definitively held that a showing of competitive injury is required. In arguing that all the circuit cases for the last ninety years have uniformly required a showing of competitive injury, the majority misconstrues cases such as *De Jong Packing Co. v. USDA*, *Farrow v. USDA, IBP, Inc. v. Glickman*, and *Armour and Company v. United States*. Although those courts held conduct that injured competition would violate the PSA, they did not hold that such injury is a required element in every case.

For example, the Ninth Circuit in *De Jong Packing Co.* applied an antitrust analysis based on the statute's antitrust background but did not hold

---

[10] The Fourth Circuit is the remaining circuit to have held that a likely competitive effect is required to find a PSA violation, but it did so in a short unpublished opinion. In *Philson v. Goldsboro Milling Co.*, 164 F.3d 625, 1998 U.S. App. LEXIS 24630, at *11 (4th Cir. Oct. 5, 1998) (unpublished), the court upheld the trial court's jury instruction requiring proof of a likely effect on competition to find a § 192(a) violation. With no analysis, the court simply cited *Farrow v. USDA*, 760 F.2d 211, 215 (8th Cir. 1985) and *Parchman v. USDA*, 852 F.2d 858, 864 (6th Cir. 1988) (quoting Farrow) to support its conclusion.

that the PSA *only* prohibits anticompetitive conduct. 618 F.2d 1329, 1336-37 (9th Cir. 1980). There, the conduct in question involved "concerted efforts to coerce a change in market practices," which facially appeared to be anticompetitive. It is not surprising that the court discussed competitive harm when dealing with a facially anticompetitive violation. The court held that a "reasonable likelihood" that harm to the market would occur was sufficient to find a violation of § 192(a). *Id.* A more recent Ninth Circuit Case, *Spencer Livestock Comm'n Co.*, held that the PSA "was not intended merely to prevent monopolistic practices, but also to protect the livestock market from unfair and deceptive business tactics." 841 F.2d at 1455 (finding that the challenged act was a deceptive practice under § 213 regardless of whether it harmed consumers or competitors).

*Farrow* is often cited for the proposition that a practice must injure or be likely to injure competition in order to be considered unfair under the PSA. 760 F.2d 211 (8th Cir. 1985). In fact, the court held that "[a] practice is 'unfair' under § 213(a) if it injures or is likely to injure competition." *Id.* at 214 (citing *DeJong Packing Co*, 618 F.2d at 1336-37). In context, this holding does not necessarily imply that injury or likely injury is *necessary* for a violation. The court was addressing conduct that appeared to fall into an antitrust framework (an agreement between two livestock dealers not to compete against each other for purchases at a certain auction), and the court's discussion centered on the *degree* of evidence required (whether the harm had to be actual or could be merely potential) and not the *type* of harm (competitive or otherwise) that the statute required. A discussion of competitive injury in the context of a facially anticompetitive violation does not ineluctably lead to the conclusion that the PSA is limited to anticompetitive injury. The most recent Eighth Circuit case to address the issue, *IBP v. Glickman*, was similarly equivocal; it held that a "right of first refusal" agreement between a group of feedlots and a meatpacking

company, which did give some preference to the meatpacker but did not do so "unduly, as required for a violation of the Act," did not "potentially suppress or reduce competition sufficient to be proscribed by the Act." 187 F.3d 974, 977 (8th Cir. 1999). Holding that a violation that potentially suppresses or reduces competition would be sufficient to be proscribed by the PSA does not mandate the converse. While *Farrow* and *Glickman* hold that an act that injures competition may be unfair under the PSA, they do not hold that all unfair acts must injure competition.

A third Eighth Circuit case cited by PPC offers even less support for the proposition that the PSA requires a competitive injury showing. In *Jackson v. Swift Eckrich, Inc.*, the court affirmed the district court's holding that, as a matter of law, "the claimed actions . . . were neither deceptive or injurious to competition, *nor* were they unfair, unjust or unreasonable." 53 F.3d 1452, 1458 (8th Cir. 1995) (quoting *Jackson v. Swift Eckrich, Inc.*, 836 F. Supp. 1447, 1456 (W.D. Ark. 1993) (emphasis added)). The district and circuit courts thus separated "unfair, unjust or unreasonable" actions from those "deceptive or injurious to competition," implying that a showing of *either* was necessary, but not necessarily both. Although both courts ultimately found that the defendant's actions did not violate § 192(a) and (b), neither even mentioned competitive injury in its discussion.

In *Armour*, the Seventh Circuit focused on the lack of competitive harm in deciding that a 50-cent rebate to purchasers of thick-cut bacon was not "unfair" under § 192(a) and (b). 402 F.2d 712 (7th Cir. 1968). Given that the allegations involved price cutting, the focus on competitive harm is again not surprising. When the alleged unfairness involves price cutting it necessarily requires an inquiry into predatory intent or competitive injury because it is often difficult to distinguish between predatory and healthy pricing practices. *Id*. at 720. In fact, a claim alleging price cutting fits much better within subsection (c),

51

which does require competitive injury, than it does subsection (a). *Armour*'s analysis is thus muddied by the fact that it involves a claim that should have been brought under one of the competitive subsections. *Armour* also suffers from many of the same problems that plague *London*. For instance, it failed to construe the plain language of the statute and instead attempted to determine the purpose of the PSA viewed through an antitrust lens. *Id.* at 722 (construing the PSA as if it were merely another antitrust law). Furthermore, the Seventh Circuit's PSA jurisprudence is far from uniform or clear. *See Schumacher v. Tyson Fresh Meats, Inc.*, 434 F. Supp. 2d 748, 753 (D.S.D. 2006).

In short, although several circuits have held that practices that harm competition are unfair within the meaning of the PSA, these holdings do not necessarily support this court's holding that § 192(a) and (b) require a showing of competitive injury. Even if they did, the holdings of other circuits do not relieve this circuit of its responsibility to attempt to reach the correct result based on the well-established methods of statutory interpretation. Predictability may be important, but it does not trump the correct result. *See Aviall Servs.*, 543 U.S. 157 (relying on the plain text to reverse scores of contrary circuit decisions).

## VI

As Judge Hartz explained in his well-reasoned concurrence, *Been*, 495 F.3d at 1241 (Hartz, J., concurring/dissenting), a construction of the PSA that does not require competitive injury is further bolstered by the Supreme Court's interpretation of similar language in the Federal Trade Commission Act ("FTC Act"). Using language similar to § 192(a) of the PSA, § 45(a)(1) of the FTC Act provides: "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared

unlawful." 15 U.S.C. § 45(a)(1); *see Armour*, 402 F.2d at 722 ("Section 202(a) should be read liberally enough to take care of the types of anti-competitive practices properly deemed 'unfair' by the Federal Trade Commission (15 U.S.C. § 45) and also to reach any of the special mischiefs and injuries inherent in livestock and poultry traffic."). Comparison of the PSA to the FTC Act is warranted because the PSA is an offspring of the FTC Act. *Been*, 495 F.3d at 1241 (Hartz, J., concurring/dissenting). The PSA was enacted in 1921 because the antitrust laws and the FTC Act alone were deemed inadequate in dealing with the meat packing industry. 1 John H. Davidson et al., AGRICULTURAL LAW § 3.02, at 187 (1981).

In *FTC v. Sperry & Hutchinson Co.*, the U.S. Supreme Court rejected the argument that this similarly worded provision of the FTC Act required proof of an anticompetitive effect. 405 U.S. 233, 239-40 (1972). The Federal Trade Commission ("FTC") had entered an order prohibiting certain actions of Sperry & Hutchinson (S&H), claiming it had violated the FTC Act by attempting "to suppress the operation of trading stamp exchanges and other 'free and open' redemption of stamps." *Id.* at 234. S&H challenged the order. The Fifth Circuit vacated the order and held that the FTC could halt only conduct that "violated either the letter or the spirit of the antitrust laws." *Id.* at 235. The FTC appealed to the Supreme Court and there admitted that S&H's conduct violated neither the letter nor spirit of the antitrust laws; but rather, it contended that the power given to the FTC by the FTC Act was not limited to antitrust violations. *Id.* at 239. The Supreme Court agreed, holding that the FTC Act "empower[s] the [FTC] to proscribe practices as unfair or deceptive in their effect upon consumers **regardless of their nature or quality as competitive practices or their effect on competition**." *Id.* (emphasis added). This flexible approach in *Sperry & Hutchinson* also reaffirmed the Court's earlier holding that "[t]he point where a method of competition becomes 'unfair' within

the meaning of the Act will often turn on the exigencies of a particular situation, trade practices, or the practical requirements of the business in question." *FTC v. Motion Picture Adv. Serv. Co.*, 344 U.S. 392, 396 (1953).

The history of the Court's interpretations of the FTC Act and *Sperry & Hutchinson*'s comments on that history have particular implications for interpreting the PSA. The original version of the FTC Act, enacted in 1914, did not include the language empowering the FTC to prevent "unfair or deceptive acts or practices in commerce"; the Act provided power only to prevent "unfair methods of competition in commerce."[11] Federal Trade Commission Act, Pub. L. No. 63-203, § 5, 38 Stat. 717, 719 (1914). In 1920, the year before enactment of the PSA, the Supreme Court adopted a limiting interpretation of "unfair methods of competition," restricting the covered practices to those "heretofore regarded as opposed to good morals because characterized by deception, bad faith, fraud or oppression, or as against public policy because of their dangerous tendency unduly to hinder competition or create monopoly." *FTC v. Gratz*, 253 U.S. 421, 427 (1920); *see Sperry & Hutchinson*, 405 U.S. at 241. Later, however, the Supreme Court changed course in *FTC v. R.F. Keppel & Bro., Inc.*, 291 U.S. 304 (1934). *See Sperry & Hutchinson*, 405 U.S. at 242-43. In *Keppel*, the Court held a marketing scheme could be unfair even though it did not have "anticompetitive consequences after the manner of the antitrust laws." 405 U.S. at 244. The Court then noted that the *Keppel* decision's "perspective" of the FTC Act "was legislatively confirmed" in 1938 when Congress amended the Act by adding the phrase "unfair or deceptive acts or practices" to the original ban on "unfair methods of competition." *Id.* (internal quotation marks omitted). The

---

[11] Notably, Chief Judge Jones' "terms of art" discussion makes no mention of the distinction between "unfair method of competition" and "unfair or deceptive acts or practices" as used in the FTC Act. She glosses over this critical difference by collapsing "terms of art" with markedly different interpretations into a single generic term, "unfair."

Court thought that the "unfair or deceptive acts or practices" language did not require anticompetitive conduct. *See id.* The original language in § 192(a) of the PSA made it unlawful to "[e]ngage in or use any unfair, unjustly discriminatory, or deceptive practice or device in commerce." Pub. L. No. 67-51, § 202, 42 Stat. 161. The "unfair . . . practice . . . in commerce" language is the very language construed by the Supreme Court in *Sperry & Hutchinson* as not requiring an "effect on competition." 405 U.S. at 239. The language of PSA § 192(a) more clearly omits a competitive-effect requirement than does the FTC Act language construed in *Keppel. Been*, 495 F.3d at 1241 (Hartz, J., concurring/dissenting) (noting that § 192(a) does not use the FTC Act's language "unfair methods of competition"). Thus, in construing substantially similar language in the FTC Act, the Supreme Court squarely rejected the argument that the FTC cannot prohibit a practice as being unfair unless there is proof of an anticompetitive effect. And the PSA grants broader authority to regulate than previously enacted statutes, including the FTC Act. H.R. REP. NO. 67-77, at 2 (1921) (noting that the PSA "is a most comprehensive measure and extends farther than any previous law in the regulation of private business, in time of peace, except possibly the interstate commerce act"). If the same language under the FTC Act does not require an adverse impact on competition, then it should not be construed differently under the PSA.

## VII

PPC makes a number of policy arguments favoring a construction that requires competitive injury. First, following *London* and *Been*, PPC contends that the statutory text as written may require it to defend federal causes of action for claims that would otherwise have been state law issues. *London*, 410 F.3d at 1304; *Been*, 495 F.3d at 1229 ("Not to require a showing of competitive injury or the likelihood thereof would make a federal case out of every breach of contract."). But the fact that a statute may burden live poultry dealers does not

mean that it is improper; Congress could well have concluded that such burdens were justified to protect growers. Furthermore, the Supreme Court has previously refused to add narrowing language to a statute (RICO), despite the contention that the statute as written threatened to turn an abundance of garden-variety local disputes into violations of federal law. *See Bridge v. Phoenix Bond & Indem. Corp.*, 128 S. Ct. 2131, 2145 (2008). PPC also fears the effects of a "standardless" definition of "unfair." However, to the degree that "unfair" is standardless, it is unlikely to remain so for long. Like most statutory terms, those within the PSA will receive definition and refinement through the language of the statute itself, agency adjudication, regulation, and judicial proceedings.[12] Here, the question of whether PPC's different treatment of the Growers, on one hand, and Mr. Pilgrim, on the other, was "unfair" or otherwise in violation of the statute should be determined on remand in the context of industry standards, the economic justifications for the actions, and the motives and actions of those concerned.[13]

An underlying flaw in all of PPC's policy arguments is that they implicitly urge us not to construe the plain language of the statute, but instead, to substitute our own policy determinations for those of Congress. Courts,

---

[12] For example, the USDA's interpretation of the PSA can provide some guidance. The Government noted in its amicus brief that the USDA agrees that a primary (but not the sole) purpose of the PSA is to foster competition and, for that reason, practices that have the potential to enhance efficiency should not be condemned as "unfair" under the PSA without consideration of competitive effects. This view was reflected in *London*, where the USDA took the position that the challenged act violated the statute specifically because it lacked a valid economic justification. The Secretary of the USDA has also issued regulations and policy statements clarifying § 192(a). See, e.g., 9 C.F.R. §§ 201.98-201.100, 201.108-1, 203.2(c), 203.7(c), 203.10.

[13] In her concurrence, Chief Judge Jones repeatedly states that the PSA cannot be read as prohibiting legitimate competitive activity or acts stemming from an honest and fair competitive motive. This point is in no way incompatible with the dissent's reading of the PSA. As noted, PPC would have the opportunity on remand to show that giving Mr. Pilgrim a different contract than other growers was not "unfair" in the context of industry standards, the economic justifications for the actions, and the motives and actions of those concerned.

however, cannot take the place of Congress in deciding matters of policy. *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194-95 (1978); *see also Moosa v. INS*, 171 F.3d 994, 1009 (5th Cir. 1999) (Courts "will not second-guess such policy choices properly made by the legislative branch."). A court's "individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute." *Hill*, 437 U.S. at 194; *see also Gen Tel. Co. of Southwest v. United States*, 449 F.2d 846, 859 (5th Cir. 1971) ("The wisdom or expediency of a given law or regulation is not open to question in the courts."). Because Congress's mandate is expressed in unambiguous terms, this court should not act as a "committee of review" for Congress's wisdom in enacting the PSA. *Hill*, 437 U.S. at 194-95.

Furthermore, contrary to the majority's suggestion, it is not reasonable to conclude that Congress's failure to amend the PSA should be taken as silent ratification. Courts should "not expect Congress to make an affirmative move every time a lower court indulges in an erroneous interpretation." *United States v. Welden*, 377 U.S. 95, 103 n.12 (1964) (citation omitted). "To explain the cause of non-action by Congress when Congress itself sheds no light is to venture into speculative unrealities . . . [Courts] walk in quicksand when [they] try to find in the absence of corrective legislation a controlling legal principle." *Helvering v. Hallock*, 309 U.S. 106, 120-21 (1940). As the Supreme Court has stated:

> This Court has many times reconsidered statutory constructions that have been passively abided by Congress. Congressional inaction frequently betokens unawareness, preoccupation, or paralysis.

*Zuber v. Allen*, 396 U.S. 168, 185 n.21 (1969) (internal quotes omitted); *see also Prostar v. Massachi*, 239 F.3d 669, 678 (5th Cir. 2001) ("Inertia is endemic to the legislative process, rendering congressional inaction a problematic interpretive guide."). By giving significance to Congressional silence, the majority improperly

bases its decision on speculation rather than the plain text of the statute.

## VIII

For the foregoing reasons, I respectfully dissent from the holding of the court. I would affirm the order of the district court.